DAVIS, Judge.
Appellants, Ameraquatic, Inc., Applied Aquatic Management, Inc., Aquatic Systems, Inc. and Boliden Intertrade, Inc. appeal an order by a hearing officer of the Division of Administrative Hearings determining the validity of proposed revisions to Chapter 16C-20, Florida Administrative Code. The Department of Natural Resources (“DNR”) has filed a cross-appeal.
Appellants challenged DNR’s proposed revisions to Chapter 16C-20. Chapter 16C-20 sets forth DNR’s aquatic plant management policies and regulates the application of herbicides for plant control in aquatic systems. Appellants challenged the proposed revisions to Chapter 16C-20 as an unlawful exercise of delegated legislative authority. Appellants alleged that DNR’s proposal to regulate herbicides used in the chemical control of aquatic plants exceeded the scope of DNR’s rule-making authority; that DNR’s provisions for herbicide selection and application review reserved unbridled discretion to DNR; and that DNR’s proposal to regulate aquatic plant control activities in privately-owned waters was overbroad. After an evidentiary hearing, the hearing officer entered a final order determining that Chapter 16C-20 was valid in part and invalid in part. The hearing officer severed the invalid provisions.
On appeal, appellants argue that section 369.20(7), Florida Statutes and section 369.22(12), Florida Statutes, are invalid delegations of legislative power. Appellants also argue that the hearing officer erred in ruling (1) that DNR could regulate the use of pesticides under its statutory grant to regulate aquatic plant control activities; (2) that proposed rules 16C-20.0045(2) and 16C-20.0055(l)(a)5 are valid exercises of delegated legislative authority; and (3) that DNR’s authority to regulate aquatic plant control ac *117 tivities extends to privately-owned water bodies.
On cross-appeal, DNR asserts that the healing officer erred in ruling (1) that proposed rule 160-20.0015(11) modified the implementing statute and is therefore an invalid exercise of delegated legislative authority; (2) that portions of proposed rules 16C-20.002(2), 16C-20.0035(l)(a) and 16C-20.0035(l)(c) are invalid exercises of delegated legislative authority; (3) that proposed rule 160-20.0075(2) is an invalid exercise of delegated legislative authority; and (4) that Boliden Intertrade Inc. had standing to participate in the rules challenge proceeding.
We hold that the hearing officer erred in ruling that proposed rule 160-20.0015(11) modified the implementing statute and is therefore an invalid exercise of delegated legislative authority. We also hold that the hearing officer erred in ruling that proposed rule 16C-20.0035(l)(a) and a portion of proposed rule 16C-20.0035(l)(c) are arbitrary and capricious. We find no merit to the issues raised by appellants nor to the other issues raised on cross-appeal by DNR, and therefore affirm as to those issues.
Appellants argue that section 369.20(7), Florida Statutes and section 369.22(12), Florida Statutes, are invalid delegations of legislative power because the statutes delegate unbridled discretion to DNR to define and weigh criteria and standards regulating aquatic weed control activities. Section 369.20(7), Florida Statutes (1991), provides:
No person or public agency shall control, eradicate, remove, or otherwise alter any aquatic weeds or plants in waters of the state unless a permit for such activity has been issued by the department, or unless the activity is in waters expressly exempted by department rule. The department shall develop standards by rule which shall address, at a minimum, chemical, biological, and mechanical control activities; an evaluation of the benefits of such activities to the public; specific criteria recognizing the differences between natural and artificially created waters; and the different amount and quality of littoral vegetation on various waters. Applications for a permit to engage in aquatic plant control activities shall be made to the department. In reviewing such applications, the department shall consider the criteria set forth in subsection (2).
The language of section 369.22(12) is identical to that of section 369.20(7), except that section 369.22(12) addresses the control of nonindigenous aquatic plants.
We hold that section 369.20(7), Florida Statutes and section 369.22(12), Florida Statutes, are valid delegations of legislative power. The legislature may not delegate the power to enact a law or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law. Conner v. Joe Hatton, Inc., 216 So.2d 209, 210 (Fla.1968). The legislature may perform its function by laying down policies and establishing standards while leaving to agencies the making of subordinate rules within prescribed limits and the determination of facts to which the policy, as declared by the legislature, is to apply. Husband v. Cassel, 130 So.2d 69, 71 (Fla.1961). The fact that some authority, discretion or judgment is necessarily required to be exercised in carrying out a purely administrative or ministerial duty imposed by a statute, does not invalidate the statute. Conner, 216 So.2d at 210. Although the legislature is obliged by the nondelegation doctrine to establish adequate standards and guidelines, the drafting of detailed or specific legislation may not always be practical or desirable. State, Dep’t of Citrus v. Griffin, 239 So.2d 577, 581 (Fla.1970); Microtel, Inc. v. Florida Pub. Serv. Comm’n, 464 So.2d 1189, 1191 (Fla.1985). Under such circumstances, subordinate functions may be transferred by the legislature to permit administration of legislative policy by an agency with the expertise and flexibility needed to deal with complex and fluid conditions. Id.
In the present case, the legislature articulated its policy with regard to the control of nonindigenous plants in section 369.22(3), Florida Statutes. In section 369.22(3), the legislature recognized that the uncontrolled growth of nonindigenous aquatic plants in the waters of Florida poses a variety of environ *118 mental, health, safety and economic problems. The legislature acknowledged the responsibility of the state to cope with the uncontrolled and seemingly never-ending growth of nonindigenous aquatic plants in the waters throughout Florida. Section 369.22(3) provides that it is the intent of the legislature that the state policy for the control of nonindigenous aquatic plants in waters of state responsibility be carried out under the general supervision and control of DNR. Section 369.22(3) further provides that it is the intent of the legislature that the control of nonindigenous aquatic plants be carried out primarily by means of maintenance programs, rather than eradication or complaint spray programs.
The legislature provided minimum standards and guidelines in section 369.20(2) and section 369.22(4). Section 369.20(2), Florida Statutes (1991), provides:
The Department of Natural Resources shall direct the control, eradication, and regulation of noxious aquatic weeds and direct the research and planning related to these activities, as provided in this section, excluding the authority to use fish as a biological control agent, so as to protect human health, safety, and recreation and, to the greatest degree practicable, prevent injury to plant and animal life and property-
Section 369.22(4), Florida Statutes (1991), provides:
The department shall supervise and direct all maintenance programs for control of nonindigenous aquatic plants, as provided in this section, excluding the authority to use fish as a biological control agent, so as to protect human health, safety, and recreation and, to the greatest degree practicable, prevent injury to plant, fish, and animal life and to property.
The record shows that each permit to control aquatic plants is site specific. There are over 7,700 lakes of greater than ten acres in size and probably over 300,000 ponds in Florida. There is a tremendous diversity among lakes and numerous variables to consider in setting up an aquatic management plan. Given the numerous factors involved in the control of aquatic weeds and plants, we hold that more detailed or specific legislation, as proposed by appellants, would not be practical.
Appellants argue that the hearing officer erred in ruling that DNR could regulate the use of pesticides under its statutory grant to regulate aquatic plant control activities because section 487.051(2) vests exclusive jurisdiction in the Department of Agriculture and Consumer Services (“DACS”). Section 487.051(2), Florida Statutes (Supp.1992), provides, in part:
This chapter is intended as comprehensive and exclusive regulation of pesticides in this state. Except as provided in Chapters 373, 376, 388, 403, and 482, or as otherwise provided by law, no agency, commission, department, county, municipality, or other political subdivision of the state may adopt laws, regulations, rules, or policies pertaining to pesticides, including their registration, packaging, labeling, distribution, sale, or use....
Appellants argue that DNR lacks the authority to regulate pesticide use under the “as otherwise provided by law” exception to section 487.051(2). Appellants further assert that DNR’s authority to regulate the use of pesticides under section 403.088(1) pursuant to an interagency agreement with the Florida Department of Environmental Regulation is limited to requiring that the product be registered and that the applicator follow the instructions on the registered label or other state standards.
In ruling that DNR has the authority to regulate pesticide use under its statutory grant to regulate aquatic plant control activities, the hearing officer recognized the “or as otherwise provided by law” exception in section 487.051(2). The hearing officer concluded that, because section 369.20(7) authorizes DNR to develop standards which address, at a minimum, chemical, biological and mechanical control activities, the legislature obviously intended that DNR could address the use of herbicides insofar as herbicides are used to control, eradicate and regulate noxious aquatic weeds. Since DNR is authorized to regulate pesticide use only to the extent that such agents are used in aquatic plant control, *119 and because DNR’s authority does not overlap with the authorization given to DACS in Chapter 487, we agree with the hearing officer’s ruling that DNR is statutorily authorized to regulate herbicide use under the “as otherwise provided by law” exception of section 487.051(2).
Appellants argue that proposed rules 160-20.0045(2) and 16C-20.0055(l)(a)5 are invalid exercises of delegated legislative authority because the rules reserve unbridled discretion in DNR to define and weigh criteria regulating aquatic weed control activities. Proposed rule 160-20.0045(2) provides:
In determining whether a permit shall be issued for aquatic plant management purposes, the department shall consider the following criteria:
(a) The noxious aquatic plant species present and the potential of the target plants to create adverse effects.
(b) The amount and quality of the aquatic plants within the waterbody and the proposed management site, and their importance to biological communities that are utilizing them.
(e)The positive or adverse impacts of the aquatic plant management activities on public interest considerations such as:
1. Health and safety of the public.
2. Navigation.
3. General public’s access to, or use of, the waterbody.
4. Riparian property owners’ access to, or use of, the waterbody.
5. Swimming, fishing or other recreational activities.
6. Water flow or the potential for flooding.
(d) The positive or adverse impacts of the aquatic plant management activities on fish and wildlife considerations such as:
1. Endangered or threatened species, species of special concern, or their prey species and habitat.
2. The potential of the management activities to improve habitat for the production of fish and wildlife, including non-game species.
3.The potential of the plant management activities to increase or improve native aquatic plant species diversity.
(e) The positive or adverse impacts of the proposed aquatic plant management activities on water quality considerations such as:
1. Native plant coverage which may protect or improve water quality.
2. Native plant coverage which may prevent or reduce shoreline erosion and runoff.
3. Nutrient levels, dissolved oxygen levels, deposition of organic matter, herbicide residues or other impacts on water quality outside of the control area designated by the department.
(f) The protection of the receiving wa-terbodies consistent with the classes of surface waters established pursuant to Chapter 17-302, F.A.C.
(g) The potential of the proposed activity to spread noxious aquatic plants, or to promote the survival and growth of native aquatic plants.
We agree with the hearing officer’s conclusion that, because the criteria set forth in proposed rule 160-20.0045(2) generally track section 369.20, Florida Statutes, the rule does not contravene the implementing statute or exceed DNR’s rulemaking authority. We further agree with the hearing officer’s conclusion that the criteria are precise and understandable.
The record contains competent substantial evidence to support the hearing officer’s conclusion that the assignment of specific weight to each criterion, as suggested by appellants, would be impractical. The record shows that there are more than 7,700 natural lakes in Florida which are greater than ten acres in size, and that, when manmade systems are added, there are hundreds of thousands of lakes. Mr. Catón, the environmental administrator for the permitting section of the Bureau of Aquatic Plant Management of DNR, testified that the issuance of permits by DNR is site specific. Mr. Catón did not believe that it was possible to more narrowly define the criteria because there are many variables in the environment that must be *120 considered in setting up an aquatic plant management plan. Mr. Catón explained that there is no way one can list all the variables and their interactions in a rule because there are too many things to consider.
Proposed rule 16C-20.0055(l)(a)5 provides:
When more than one herbicide is registered for use in an aquatic site, the department shall require the use of the herbicide which it determines has the least adverse effect upon human health, safety, recreational uses, non-target plants, fish, and wildlife. In determining which herbicide shall be used, the following criteria shall be considered:
a. Which herbicide will provide the greatest protection to human health, safety, and recreational uses.
b. Which herbicide will provide the greatest protection to non-target plant and animal life.
c. Which herbicide will be most effective at controlling the targeted species.
DNR concedes that, in determining which herbicide is most appropriate for a given site, DNR will be restricted to reviewing product label requirements and will not engage in independent toxicologic research and testing. Further, DNR will continue its existing practice of allowing the herbicide selection decision to be made by a DNR regional biologist in consultation with the Tallahassee office.
The record shows that it is not unusual for more than one herbicide to be registered for uses that may be appropriate for a particular site. Thus, there is a clear need for DNR to determine which herbicide is most appropriate for a given site. As noted in the hearing officer’s order, because most registered aquatic herbicides have some type of use restriction, DNR will evaluate each registered herbicide to see which product provides “the greatest protection to human health, safety and recreational uses,” or provides “the greatest protection to non-target plant and animal life,” or which is the “most effective at controlling the targeted species.” For example, an applicator may request to use a herbicide that would prevent the public from fishing for food in that waterbody for a specified number of days. If another registered product can effectively control the plants without such a restriction, DNR would approve the second product on the ground it provided “the greatest protection to human health.” Similarly, if water hyacinths are intermixed with bulrush, a beneficial native plant used for fisheries, DNR would approve a herbicide that kills the water hyacinths but does not harm the bulrush. This decision would conform with the requirement that the herbicide selected offer “the greatest protection to non-target plant(s).” Finally, if a registered product is the only one that will control the targeted plant, under the last criterion DNR would have to take this factor into account in approving one of several registered products.
Given the numerous factors involved in the control and eradication of aquatic weeds and plants, we hold that a weighing of criteria, as proposed by appellants, would not be practical. We agree with the hearing officer’s ruling that, because the criteria in proposed rule 16C-20.0055(l)(a)5 track the language in section 369.20, Florida Statutes, the rule does not exceed the statutory authorization or enlarge, modify or contravene the statute.
On cross-appeal, DNR argues that the hearing officer erred in ruling that the definition of “eradication program” set forth in proposed rule 160-20.0015(11) modifies the implementing statute and is therefore an invalid exercise of delegated legislative authority. The hearing officer found that, because section 369.20 directs DNR to control all noxious plants whether indigenous or not, the definition of “eradication program” in the proposed rule dealing only with nonindige-nous plants, is a modification of the implementing statute. Proposed rule 16C-20.0015(11) defines “eradication program” as the following:
‘Eradication program’ means a method for the control of non-indigenous aquatic plants in which control techniques are utilized in a coordinated manner in an attempt to kill all the target aquatic plants on a permanent basis in a given geographical area.
*121 Section 369.22(2)(e), Florida Statutes (1991), the implementing statute, defines “eradication program” as the following:
An ‘eradication program’ is a method for the control of nonindigenous aquatic plants in which control techniques are utilized in a coordinated manner in an attempt to kill all the aquatic plants on a permanent basis in a given geographical area.
Since DNR tracked the language of the implementing statute virtually verbatim, we hold that the limitation of “eradication program” to include only nonindigenous aquatic plants is not an invalid exercise of delegated legislative authority.
DNR argues that the hearing officer erred in ruling that the last sentence of proposed rule 160-20.002(2) is arbitrary and capricious, and is therefore an invalid exercise of delegated legislative authority. Proposed rule 16C-20.002(2) provides:
Permits issued pursuant to this chapter are not intended to allow for the collection and subsequent use of the removed plants, unless specifically provided for in the permit conditions. As a condition of the permit, any aquatic plants removed pursuant to an aquatic plant control permit may be required to be relocated in the control area to maintain habitat or for other environmental benefits.
We hold that the hearing officer’s ruling that the last sentence of proposed rule 16C-20.002(2) is arbitrary and capricious is supported by competent substantial evidence in the record. The hearing officer concluded that DNR relied upon literature, not identified in the record, to support its theory that a correlation exists between aquatic vegetation and the fish population, and the rule is based on this correlation.
Appellants presented the testimony of Dr. Canfield, Dr. Haller and Mr. Griffiths to dispute this theory. Dr. Canfield, a professor at the University of Florida with a specialty in limnology, testified that he participated in a research study of approximately 60 lakes which examined the relationship between aquatic plants and fish and determined the amount of vegetation that should remain in a controlled area. Dr. Canfield concluded that there was no relationship between aquatic macrophytes and fish, and that there might be other factors which affect the fish population. Dr. Canfield further concluded that there was no strong correlation between aquatic macrophytes and the bird population around lakes. Dr. Haller, a faculty member in the agronomy department at the University of Florida, testified that over the past 20 years, revegetation has not been a common practice and has not been necessary. Dr. Haller explained that, after vegetation is removed, wave action frequently causes native vegetation to return to the site. Dr. Haller believed that it is a hardship on homeowners to require revegetation when there is no evidence indicating that revegetation is beneficial. Mr. Griffiths, the district manager for Lake Management District, testified that in Polk County the clearing of lake fronts has not resulted in the destruction of the environment in that portion of the lake. Mr. Griffiths noted that although the wildlife in the area may change, the clearing of lake fronts had not resulted in a lack of wildlife in the cleared area.
The testimony of these three witnesses constitutes direct evidence repudiating DNR’s underlying basis for the rule. Because DNR did not adduce any evidence to the contrary other than literature not made part of the record, there is no error in the hearing officer’s ruling.
DNR argues that the hearing officer erred in ruling that the last sentence of proposed rule 16C-20.0035(l)(a) is arbitrary and capricious. Proposed rule 16C-20.0035(l)(a) provides:
No aquatic plant control permit is required by the department for the following waters:
(a) Waters wholly owned by one person, other than the state, provided there is no connection to Waters of Special Concern.
DNR asserts that testimony concerning the various uses of waterbodies supports an inference that waters owned by one person should be treated differently than waters owned by multiple owners. In ruling that proposed rule 16C-20.0035(l)(a) is arbitrary and capricious, the hearing officer concluded *122 that the record did not contain any evidence to support a distinction between waters owned by one person and waters not owned by one person. We hold that the hearing officer erred in ruling that proposed rule 16C-20.0035(l)(a) is arbitrary and capricious. Section 369.20(7) and section 369.22(12) authorize DNR to make exemptions to the permitting requirement. In addition to statutory authorization for the exemption, the record contains testimony concerning the competing uses of waterbodies and how these* uses must be taken into consideration in aquatic plant control management. There was also testimony regarding the impact of herbicides upon certain uses and how certain activities, such as swimming, fishing and irrigation may be restricted by the application of certain products. If a waterbody is owned by a single owner, there are no competing uses, nor would there be the same level of concern or need for regulation.
DNR argues that the hearing officer erred in ruling that the first and second sentences of proposed rule 16C-20.0035(l)(e) are arbitrary and capricious. Proposed rule 16C-20.0035(l)(c) provides, in part:
No aquatic plant control permit is required by the department for the following waters:
(c) In all waters, except aquatic preserves designated in Chapter 258, P.S., where riparian owners physically or mechanically remove aquatic plants to create an access corridor of sufficient length waterward from the shore to allow access for a boat or swimmer to reach open water. This access corridor shall not exceed a total of 25 feet in width....
DNR asserts that references in the record to the adverse effects of herbicides on wildlife and fish support the exemption for the removal of aquatic plants by physical or mechanical means in creating an access corridor. The hearing officer found that there was no record basis to support the allowance for the removal of aquatic plants in the 25 foot corridor by physical or mechanical means, but not by chemical means.
We find no error in the ruling that this rule is invalid to the extent that it excludes removal of aquatic plants by chemical means. Dr. Haller testified that he participated in a three-year study which evaluated grass carp, mechanical harvesting and the use of herbicides on fish populations in 24 experimental ponds in Florida. He further testified that there is no scientific basis for an exemption for mechanical removal of aquatic plants, but not for removal by chemical means because research shows that the mechanical removal of aquatic weeds kills a significant number of fish, invertebrates and snails which would have an opportunity to leave the area if chemicals are used. Dr. Haller’s testimony was not rebutted by DNR and is the only evidence on this issue.
DNR further argues that the hearing officer erred in striking the exemption for 25 foot access corridors. The hearing officer found that the 25 foot access corridor exemption was not supported by facts or logic because a 25 foot access corridor was unreasonably small. We agree with DNR that the 25 foot access corridor exemption is logically based and has not been shown to be arbitrary and capricious. Therefore, we reverse that ruling.[1]
We have examined the remaining issues raised in the appeal and cross-appeal and find them to be without merit. Accordingly, we reverse the hearing officer’s rulings that proposed rule 160-20.0015(11) is an invalid exercise of delegated legislative authority and that proposed rule 16C-20.0035(l)(a) and a portion of proposed rule 16C-20.0035(l)(c) are arbitrary and capricious. We affirm the hearing officer’s order in all other respects.
ZEHMER, C.J., and BOOTH, J., concur.

. Although an access corridor of 25 feet is logically based, we recognize that the exception to the aquatic plant control permit requirement created by proposed rule 16C-20.0035(l)(c) must fail because the proposed rule provides only for the removal of aquatic plants by physical or mechanical means.